The Honourable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honourable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honourable Court. Good morning, Mr. Braga. Good morning, Your Honour. Counsel may be seated. On behalf of the Appellate Litigation Clinic at the University of Virginia School of Law, I'd like to introduce to the Court this morning, Robert Dressel, one of our third-year students, who satisfies all the requirements for practice before this Court, and who has our client's consent to argue the appeal this morning with the Court's permission. Absolutely. Pleased to have you. Mr. Dressel, come forward. Good morning, Your Honours. May it please the Court, I am Robert Dressel and I represent the Appellant, Edmund Goines. Mr. Goines was prejudiced by his trial attorney's failure to investigate and present evidence of his diagnosed and unmedicated mental disorders. Contrary to the Court of Appeals' ruling, this evidence would have been admissible at trial. It could have been used to rebut the presumed mens rea of malice aforethought. In other words, it could have shown that Mr. Goines did not commit assault and battery with intent to kill, as opposed to supporting a defense that he could not. His trial counsel's failure led to an ineffective defense, and as a result, Mr. Goines was convicted on one count of AVIC, and automatically sentenced to life in prison without parole. Mr. Goines asks this Court to remand the case back to the District Court for reevaluation on the Strickland prejudice prong. Under the first prong of AEDPA, the State Court made an unreasonable determination of fact when it determined that Mr. Goines' mental health evidence would have been tantamount to a diminished capacity defense. South Carolina does not recognize this defense, which is in its right to do. And so therefore, it found that Mr. Goines was not prejudiced because he wouldn't have been able to present this evidence anyway. But the Court was unreasonable in determining that this evidence constitutes a defense, a diminished capacity defense. And while factual determinations by state courts are presumed to be correct, where the state court has before it but apparently ignores evidence that supports the petitioner's claim, then the fact-finding process is defective. And in South Carolina, in reversing a PCR court, the Court of Appeals had to have found that there was no evidence in the record supporting the PCR's finding. If there is any evidence in the record, then the Court of Appeals had to uphold the PCR court's finding. Now on that point, I'm not sure what you suggest we are supposed to do with that. In other words, you're not suggesting or arguing, are you, that we review the Court of Appeals' review of the PCR court? No, Your Honor. That merely contributes to the unreasonable factual determination that the Court made because it ignored evidence that was in the record that not only supported the fact that Mr. Goines should have been able to present this evidence, but the PCR court relied on that very evidence that supports that in issuing its determination. But if an appellate court, as you put it, ignores evidence, that's a legal error, isn't it? That's not a factual error. Calling this evidence a diminished capacity defense is a mixed question of fact and law. So it incorporates both issues, but the evidence that the State Court of Appeals ignored is a factual issue, and it ignored facts that support Mr. Goines' ability to present this evidence. There are two important things to understand considering this issue of factual determination, and that is the distinction between an affirmative defense and defensive use of evidence. And the second thing is how South Carolina treated the diminished capacity defense. In 2002, this court decided U.S. v. Worrell, and it offered a clear explanation of that distinction. It said that there's a difference between offering evidence to show that a defendant did not do it versus offering evidence to show that he could not commit the crime or he could not help but commit the crime. That case concerned the IDRA, which prohibited affirmative defenses regarding mental capacity or mental insanity short of insanity. And the issue was whether presenting psychiatric evidence to negate a specific and requisite element of a crime was different than offering that evidence to support an affirmative defense. And you're saying that he should have been able to use this to negate the mens re? Correct, Your Honor. Well, in Gill, the South Carolina court defined and described the diminished capacity doctrine as the diminished capacity doctrine allows a defendant to offer evidence of his mental condition with respect to his capacity to achieve the mens re required for the commission of the offense charged. So isn't that exactly what you're trying to do now that the South Carolina court has already foreclosed? No, Your Honor. How is that different? So like you said, Gill concerns the capacity of a defendant to achieve the requisite mens re. And so it has to do with his ability. And so you can't, a defendant can't present a defense that says I could not, it was literally impossible for me to achieve this mens re. That's not what Mr. Goins is arguing, that he could not achieve malice a forethought. That doesn't even really make sense. What this evidence does is it rebuts the evidence that the state presented and that the state clearly wanted the jury to infer from that Mr. Goins did achieve or have acted with malice a forethought. So the state, there are two ways that the state presented to the jury that Mr. Goins acted with malice a forethought. And that was first the use of the deadly weapon, which in this case was a mop handle. And South Carolina at the time. A sharpened mop handle. Yes. At the time, Mr., at the time South Carolina allowed juries to presume malice a forethought from use of a deadly weapon. But the judge instructed the jury on that presumption. And there was a, there was a disagreement or an issue as to really how sharp the mop handle was. And it didn't meet the strict definition of deadly weapon. And so the judge also instructed the jury on how it could find that something else is used as a deadly weapon. And it had to cause serious harm or death. But in this case, the mop handle did neither of those things. And the other way that the state proved or attempted to prove malice a forethought was by piecing together Mr. Goins' actions on the day of this incident or melee. He tore off all his clothes and put his underwear on his head. And the state argued that this was in an attempt to lure the guards down to his cell. And the underwear on his head was to prevent the mace from debilitating him. He flooded his cell in an attempt, again, to lure the guards down. And his nudity combined with the wetness of the flood made it so that the guards couldn't grab hold of him during this melee. He was screaming for his medications, again, in an attempt to lure the guards down, lying in wait. And so the state pieced together all of these events and said, ladies and gentlemen, this is a scheme. This is a deliberately laid out and executed plan to attack these guards. But if the jury had heard that Mr. Goins suffers from, not only suffers from bipolar disorder, which the jury did hear, but if that had actually been supported with evidence and the jury had learned that in 1997, Mr. Goins had been involuntarily committed after climbing a water tower naked, screaming that he was the Lord and Savior Jesus Christ and wanted to die for people's sins, and it was after that event that he was diagnosed and placed on medication, and that throughout the next year, his returns to the hospitals showed that with this medication, his conditions improved and his insight and thought processes improved, then it would have shown that, you know what, maybe these events weren't part of this deliberate scheme to attack these guards, and that all Mr. Goins would need is one juror to have reasonable doubt. And that's what this evidence presents. You know, in both events, or in both cases, Mr. Goins was naked. You know, that event alone, both cases involve water, and the second one involved Mr. Goins screaming for medication. And so with the presentation of this evidence, it simply creates a reasonable doubt as to whether or not Mr. Goins had malice aforethought. And that's sort of another distinction between defensive use of evidence and an affirmative defense. An affirmative defense, you know, not only do you need to provide notice and there needs to be an instruction, but if there's evidence sufficient to support that defense, the jury has to find the defendant innocent. But this evidence wasn't being used for that purpose. Your argument is that if they said that he was walking around in his cell with a cane, tapping on the wall, and they would say, well, he was pretending to be blind in order to get the guards inside, you should be able to give evidence that he really was blind. Is that basically what you're saying? Yes, Your Honor. So that he, yes, so he wasn't faking it. It's not about diminished capacities. The point is that other than just a nefarious plan to lure him in, he had a real medical condition that was consistent with what he was doing other than being a motive. Correct, Your Honor. So there might have been genuine and alternative reasons for why he did what he did that day. And an affirmative defense also excuses or justifies the criminal act. And in this case, you know, there is no justification for why Mr. Goins attacked these guards. He did. And he pleaded guilty to, at the very least, assault and battery. And even assault and battery of a high and aggravated nature. But what there is evidence of is an explanation behind the actions Mr. Goins took that day, that the state used in order to argue and in order to try to prove that he had malice a forethought. And without that, without being able to prove malice a forethought, then Mr. Goins might have been found guilty of the lesser included offense of high and aggravated nature. Which would have been mandatory life. Which would have prevented him from automatically being sentenced to spend the rest of his life in prison. And so it was critical for the jury to hear this evidence because it would have provided them with the opportunity to make that decision as to whether this was a criminal act with malice a forethought or a mental health event or just not a criminal act with malice a forethought. And by his attorney's failure to present, to even investigate the existence of this evidence, the jury was robbed of the opportunity to make that decision. And even still, Mr. Goins' trial counsel presented or in direct asked Mr. Goins whether he had been diagnosed with bipolar disorder. Whether he was manic depressive. And asked him, you know, do you experience highs and lows? And Mr. Goins said yes. But he didn't connect that at all to his defensive strategy or the relevance to the defense at all. And so, and it never got brought up again until closings where he sort of made a fleeting reference to it in his closing statement. And the state lambasted Mr. Goins and his defense for doing that. For, you know, kind of offering this, you know, throwing a plate of spaghetti at the wall and hoping it sticks without providing any evidence to support that. And he said, you know, where's the doctor? If he wanted to prove this to you, he could have called the doctor. He called two other witnesses. And so, Mr. Goins' attorney's meager attempt at using this evidence and not having any evidence to back it up because he didn't investigate any of it. Not only, you know, not only did the failure to investigate prejudice Mr. Goins, but the meager attempt at using what little evidence his attorney had prejudiced, ended up prejudicing Mr. Goins because he looked like a liar up on the stand. And so, even if this, you know, if the state court of appeals ruling is considered reasonable, then there are also due process concerns that come up because Mr. Goins had the right to present relevant evidence that was favorable to him on the malice aforethought element. And the state had to prove that element regardless of the presumption beyond a reasonable doubt. But in finding that Mr. Goins would be asserting a diminished capacity defense without that, without it truly and actually fitting under even South Carolina's own definition of that defense, it violated Mr. Goins' due process right to do that. As a simple matter of due process, Mr. Goins is guaranteed a meaningful opportunity to present a complete defense. And not only did the state court of appeals, not only does its ruling preclude that, but Mr. Goins' attorney's failures resulted in him not being able to present a complete defense. This evidence was his best opportunity at rebutting the malice aforethought element because without it, he really didn't have a defense. It was simply that he denies having intent. And his attorney just repeatedly informed the jury that this is an issue in this case. It's up to you to decide whether or not Mr. Goins had intent. That was the extent of his defense as to the intent element. And moreover, the trial court never made any ruling on the admissibility of this evidence. What little bit was admitted was never objected to by the prosecution. It was never interfered with by the trial judge. The PCR judge, in his questioning of Mr. Goins' trial attorney, made sure to distinguish and clarify himself saying, I'm not suggesting that Mr. Goins had any opportunity for a mental health or mental illness defense. I'm wondering whether or not seeking an evaluation, how that could have been used in the trial to rebut the intent element. And Mr. Goins' trial attorney admitted during the PCR hearing that, you know what, I could have used that evidence in trial, and if I had, it might have made a difference. But there was no trial, right? I'm sorry, Your Honor? There was no trial. Can we plea to all of this? I see I'm out of time. May I answer your question? Mr. Goins attempted to plead to the lesser included offenses, but there was a trial on all three counts. He was charged with three counts of assault and battery of intent to kill, and there was a jury trial, and he was found guilty on the one count, but then the lesser high and aggravated nature on the other two counts. On the intent to kill? Correct. So there was, well, not intent to kill, because in South Carolina, you don't need an actual intent to kill to be found guilty. You just need the malice of forethought. But that's the intent to kill. Correct, correct. So, yes, there was a trial. Okay. All right, thank you, Your Honor. Thank you, Mr. Bissell. Mr. Mabry? Yes, Your Honor. May it please the Court? Absolutely. My name is Anthony Mabry. I'm an assistant attorney general in South Carolina. I represent the warden in this case. As you've heard, Mr. Goins was convicted at a trial in Cherokee County, South Carolina of assault and battery with intent to kill and two counts of assault and battery of high and aggravated nature after a jury trial. And in this jury trial, he testified under oath. And Mr. Goins' explanation for what happened in this incident had nothing to do with psychiatric medication, had nothing to do with his psychiatric condition. He testified that earlier in the day, another sergeant who was not involved in this incident, Sergeant Crocker, saw the mop handle in his cell and told him to hand it through the food tray. He was in an isolation cell. And when he handed the mop handle through the food tray, Sergeant Crocker sprayed him through the food tray with mace and it went up Mr. Goins' nose. That led to a severe sinus condition and a headache. And from that point on, Mr. Goins said he was asking for Benadryl and Tylenol. That was it. That's all he was asking for and they wouldn't give it to him. So then he starts kicking on the door about 6 p.m. and he had stuffed his uniform down in the toilet and flooded his cell along with another cellmate on the cell block. So you've got two inmates acting together. They flood the cell and the officers come down and he's kicking on the door, screaming that he wants his Benadryl and his Tylenol. And he testifies under oath, Mr. Goins, that he put his underwear on his head to keep his head warm because he was wet and there was air conditioning in the cell that he was in. That was wet because he flooded the cell. He then tells the jury that they had warned me when they opened the door,  basically they're going to beat me up or kill me. So he gets up and he admits he made the shank and he's got it up in the pillow like a shield. He's acting like a gladiator. And he forces his way into the hallway to get on the security camera so he can't be beaten or killed in his cell when no one watches. There would be evidence. So the guards couldn't abuse him because of the security camera. And he says he continually slipped and fell, slipped and fell, and slipped and fell. He never intended to stab anyone. That was his version at trial. And it didn't work. Obviously it didn't work. He was on video. The jury saw the video. The shank that he made. What do you mean it didn't work? Sir? He was convicted, you're saying. Right. Well, it didn't work. What did you say that's inconsistent with someone with bipolar having an episode? He did not attribute it at trial to being bipolar. No, because that's why you have effective counsel to help you. A lot of people, like telling somebody who's manic-depressant, cheer up. I mean, if you could cheer up, you wouldn't be manic-depressant. I mean, he needs someone to get expert testimony. I mean, he doesn't know. I mean, I'm just saying that's what the evidence would be if you had a lawyer who would put on evidence. And what you just said was consistent with your view that this is a person doing something intentional with all those kinds of things. That's appropriate, and you prevail. I understand why. Right. But what counsel is saying, Mr. Dressler is saying, that's because he didn't have an effective counsel to explain that all this was consistent with his well-documented bipolar problem. That's what he said. So as a motive, because you said it was all deliberate, don't you? You said he put it himself. I'm not saying deliberate. I'm telling the court that's what he testified to in front of the jury under oath. Exactly. Sometimes that's the best. That's the whole idea when you try cases. Your client doesn't understand. You understand? That's why you have experts. You know, he really, you know, you see how he testified? For example, experts say, you see how he presented today? That's exactly what he's doing. He's covering. He's projecting. But let me tell you what's really going on. That's what experts do. I mean, you're laughing, but exactly right. Have you ever had experience with defending people who have mental disorder? They could spin yards. You would think they're Ph.D.'s. But an expert will tell you, no, this is exactly what he or she is doing. That's acting out in their DSM-3. That's why you have experts and not us like you chuckling because you think that's absurd. But that's what experts do, explain how people, for example, are even multi-personalities. It seems funny, but it's well-documented. So that's why we have lawyers, hopefully, that are effective. They put experts on to explain it so, like you, jurors won't chuckle at it or think that they're lying when all the lawyer does is just mention, hey, by the way, are you bipolar? Do you have highs? Do you have lows? You're talking and you're quiet on the stand. Counsel testified at the PCR hearing, Judge Gregory, that I met with him. He was completely lucid. He completely explained to me in a lucid manner everything that happened that day. And that's what counsel presented to the jury. Did counsel talk to an expert? No, he didn't. But this defendant did not offer an expert at PCR. So he still hadn't proved under the case law with this circuit, the Fourth Circuit, and even South Carolina, you have to present an expert at PCR if you're claiming counsel should have retained an expert. To this day, Mr. Goins has never called an expert to say what you are suggesting should have been done. Hadn't met his burden of proof. It's never happened. Here's the problem, though. He testifies under oath in front of the jury that the reason this happened is because they wouldn't give him his Benadryl and his Tylenol for his headache. At PCR, he completely changed his story. He said, here's what happened now, Judge Early. I did intentionally stab those guys, and it was because I didn't have my psychiatric medicine. The first version was I slipped and fell, and I slipped and fell, and slipped and fell in front of the jury. Then he changes his testimony under oath at the PCR and says, no, I didn't slip and fell. I intentionally was trying to injure the man. I just didn't have my psychiatric medicine. So what's happening is he tried one version in front of the jury, and it didn't work. Part of the problem for me, I appreciate your argument, but it's a little odd to me to have you, effectively you're a prosecutor here. I understand you're not really. You're here representing the warden on a post-conviction. But you're hammering his testimony, but if counsel had done an adequate investigation, maybe he never would have testified at the trial in the first place. Well, we don't know that. Well, but that's the problem. That's the problem, and that's part of what the PCR court focused on, that you don't know what would have happened, and the question is, what would a reasonable lawyer have done under the same or similar circumstances? Respectfully, Judge Davis, we're in the PCR context now. This is an appeal from a PCR, not the trial. He has the burden of proof. Well, it's not an appeal from a PCR. This is a certificate of appealability from a federal district judge's decision. Yes, I agree with that. Okay. But the decision of the federal district court had to do with the PCR. This is an ineffective assistance claim. He's got the burden of proof, and he's got to prove if counsel should have retained an expert what that expert would have said. He still hadn't called an expert. We don't have an affidavit from an expert. Okay, so that doesn't have anything to do with what he testified to, either at trial or in the PCR. Now you're talking about things that seem to me to matter here. He didn't call an expert, and so how can a federal district judge without an expert foundation reach a conclusion that the state court was unreasonable in its rejection of this ineffective assistance of counsel claim? It doesn't have anything to do with how he testified. Well, but that's the context of what happened. What they're trying to do is they want another bite at the apple to try a different version of what happened. That's what this is really about. One, it might be more palatable to the jury, and our cases say you don't get to do that. You don't get to change your testimony under that. Does South Carolina law, would it permit the kind of testimony that appellant is arguing now? No, ma'am. That's what I was about to get to. The bottom line in this case is the substantive law of South Carolina is we don't allow diminished capacity as affirmative defense or as putting in testimony at the trial that you couldn't inform men's right. That is Gill, that is Santiago, and that's what the Court of Appeals held in this case. Now if they wanted to challenge that and say that violates due process, that should have been done on direct appeal. We're not here on direct appeal. We're here in federal habeas deciding whether the Court of Appeals was correct in reversing the PCR court judge, and they are correct because South Carolina law doesn't even allow what this defendant is trying to do. He cannot meet the test for insanity. This is Clark versus Arizona. The United States Supreme Court said it's not a due process violation for a state to channel this kind of evidence to a question of insanity or guilty but mentally ill. Counsel, may I ask you a question? Yes, sir. You mean to tell me that if counsel had done his or her job, his job in this case, and actually consulted with and had an expert to testify that, in fact, he does have, he's bipolar, has been so for many years, has had another incident where he was on a tower, as counsel said, saying things that, obviously, in our minds, from a normative standpoint, don't make sense. To him, it probably did. And you mean to tell me that if the government, South Carolina's argument was this, that he put the underwear on his head, did all these bizarre things solely for the purpose of luring in the guard, the correctional officer, it would not be admissible that, in fact, he has a well-documented, undisputed mental disorder that's consistent with that behavior and being an alternative explanation for his prior incident conduct? That would not be admissible? No, sir. How in the world would it not be admissible? Because that's the substantive state law of South Carolina, which this Court cannot review. That's not diminished capacity. That is diminished. That's how we define diminished capacity. If that's the definition of diminished capacity in South Carolina, South Carolina is probably unconstitutional. They didn't raise that issue. They could have raised that issue on direct appeal, and they did not. Wait a minute. Yes, sir. It certainly has to be unconstitutional. You mean to tell me that's not diminished capacity, that's just an explanation for what you claim to be deliberate and nefarious things to set up? Diminished capacity deals with really the capacity to form the intent, the mens rea, of the crime done, correct? That's exactly right, and that's malice in this case. I know, I know. That's your argument. Right. But to set that up, South Carolina in the case said no, he did all of these pre-crime things solely to set up the crime. Correct. So if you have a mental disorder that explains the setup, not the crime, that's the capacity part, but the setup part that's consistent with your disability, that would be inadmissible? You can't admit psychiatric testimony. Or diminished capacity. Or evidence to show that you could not form malice. That's what I'm saying under South Carolina law. You cannot introduce that. He's not saying he could not. He's saying that what he did was consistent with who he is. That's the same thing. We don't allow that testimony. If he can show that he did not know the difference between right or wrong, or that he knew the difference between right or wrong but couldn't conform his conduct, then we allow that testimony. So if in South Carolina you were in a bar and you had an alcoholic beverage, well, you hadn't had it yet, but you had your drink there, you weren't otherwise drunk, this was the first one, and unbeknownst to you, this is undisputed fact, unbeknownst to you, someone slipped LSD into your drink. You didn't know. That's undisputed. And then you drank a bit of it. And then you went into hallucination. Right. And you committed a crime. It would not be admissible that that wouldn't be admissible? Yes, it would. Why? We have involuntary intoxication as a defense. Involuntary? Involuntary intoxication. Somebody drugs you and you commit a crime, then you can introduce that evidence, yes. But trying to disprove. But you have something that you have no control over and you're sick, that's not admissible. You have to prove you didn't know the difference between right or wrong or you couldn't conform your conduct. We have said over and over again, you cannot introduce psychiatric testimony or evidence to say you could not form malice. And that's exactly what Arizona did in Clark v. Arizona. And the United States Supreme Court said that's fine. You can channel expert testimony, Judge Gregory, to the issue of insanity. You can say I'm not going to let you introduce insanity expert testimony to disprove the men's right. And it doesn't violate due process. That's what Clark v. Arizona says. It was a 2006-2007 case. That's men's right as to committing the crime. Correct. But that's what I'm, I guess, I think we're talking about the same thing. But if you're offering that testimony to say I couldn't form malice, we don't allow you to do that. But we do allow you to do it if you're offering it to show you're insane or guilty but mentally ill, which is a different thing. So here's the problem with that. And the Supreme Court in Clark said this is the problem with that. You allow people to offer that kind of testimony on men's right and the jury buys it and finds them not guilty, then they walk out on the street and they're still mentally ill and insane and they don't receive any treatment. If you're found not guilty by reason of insanity, you're committed and treated until you're put back on the street. If you just let them put that kind of expert testimony in to negate men's right and a jury finds, well, the state didn't meet the men's right, we find him not guilty, he walks out of the courthouse and may just start stabbing somebody else or killing somebody else. That's the problem. So y'all don't have green warrants in South Carolina yet? We don't have what? In Virginia they're called green warrants. A person, whether you're insane or not, if you're in a situation where your mental condition is such that you're a danger to yourself or others, you can be put in, you can be confined. We have something like that. Wait, but you said, you know, South Carolina is either insane or not guilty. If you're not guilty, you walk out. No, I'm saying the U.S. Supreme Court said that. That's the reason Arizona does it and why other states do it the way we do it. Because if he's found not guilty, he walks out of the courthouse, I don't know how long it's going to take to get a green warrant. Do you have a theory as to why the jury split its verdict the way it did? Yes, because he was on top of this officer stabbing down at him, and he only stabbed the other two people because they grabbed him or were trying to pull him off of Officer Blackwell. So he was reaching back and caught her one time, I think, and he caught the trustee one time. But the testimony at the trial was he was on top of the guard stabbing like this, and then he put both hands on the shank and was coming down at him like that. All within the same fray. All within the same fray. In our state, like, sorry, as it was explained to you, you don't have to have an intent to kill, you just have to have malice. But the jury hears that. I've been sitting here listening to this. I thought Mulaney v. Wilbur got rid of all this nonsense, with all respect, over malice forethought. That's 1975. Nobody talks about malice forethought anymore. People talk about intent to kill. And the whole problem that the Supreme Court thought it had fixed in Mulaney v. Wilbur was all this nonsense about malice forethought. Who knows what that is? Nobody knows what that is. And you just explained he's stabbing two of the correctional officers when they're behind him, and because he used two hands to stab the other one, a lot of people would say that's ridiculous, to say that he intended to kill this one but he didn't intend to kill the others. He's using the same weapon, in the same refrain, in the same dangerous way. Correct. I can only tell you what I think happened. But our juries are told assault and battle with intent to kill in South Carolina, and that's our substantive law. We decide how to do that. They can find malice from an intent to kill or a wrongful intent to cause serious bodily injury. And he was on top of this guard stabbing down at him. That's why they convicted him of the ab wick. And there was testimony from an inmate. The reason he pulled Mr. Goins off the guard was to keep him from killing or keep him from murdering him. I think he said kill him. So I think this jury went back there and said he was trying to kill Officer Blackwell. The other two got hit incidentally, so that's why they were convicted of the other offenses. So I take it, of course, you may have to appear before this judge, so you're going to be kind, but the PCR judge just got it all wrong, had a bad day. And I like Judge Early. I think he's a great judge, but he got snowed. He'll appreciate hearing it. And I mean that. I really do like him. He's a really good judge, but he got it all wrong. How long has he been a judge in South Carolina? Ten, 15 years. So he knows South Carolina law. Well, he got snowed at the PCR. He got snowed? He got snowed. Judge, I'm not going to like hearing you say he got snowed. Well, he did. The PCR lawyer put up all this stuff about diminished capacity, and unfortunately, whoever was handling it for us didn't point out we don't recognize diminished capacity, and then the Court of Appeals straightened him out. But that's our substantive criminal law. We can define our criminal law the way we want to, and we simply do not allow you to use this kind of evidence. There are some limitations. Yeah, there are some limitations. This may not be the case to try that, because as you say, South Carolina lawyers, I think it's pretty broad in terms of pushing that to the outer envelope maybe. But anyway, that's another matter. Go ahead. Yes. But anyway, Clark v. Arizona is clear on this. We can channel this kind of evidence. And the evidence he offers here is not observation evidence. You can call, and we didn't actually at the trial, we didn't prohibit him from calling anybody. The state didn't. So there's no due process violation by the state. And he didn't raise that on direct appeal. But this is not observation evidence. He wants to put in old medical records from 1997 about what happened to him in 1997. And when he testified at this trial, he didn't claim he was psychotic. He didn't think he was Jesus Christ. He didn't think he was God. He didn't think he had to jump off a water tower to save him. Because you had given him his medication by then. There's no testimony to that.  Well, yeah, there is, yeah, there is. Thank you. Yeah, yes, he did. He said he was. That's what the whole idea of putting him on the stand. My goodness, I can't believe a lawyer put a client on the stand. He's deprived of his medication, his Thorazine, and then the day he testified, he has all he's supposed to have then. Yeah, but when he testified at the trial, he was on his medication. I know, but that's my point. Right. That's my point. He was on it. Don't medicate my client. No, you kept him in the cell without medication for six weeks. Now he's going to testify just like he was that day. But never mind. I understand your argument, and your light is green. I appreciate your argument. Thank you. Yes, sir. Mr. Dressel, you have some time reserved. Mr. Dressel, don't you have a problem here? Even if, and I understand your point, and I think it's well taken, and I must say I have quite a bit of, can understand it, but don't you have a problem you don't have a foundation from the PCR record as to what an expert would have said about the situation? No, Your Honor. You do need an expert presence when you're arguing you should have been able to present an insanity defense or when you're saying you should have been able to call an expert to rebut the other side's expert. But if you're just saying we should have been able to make such-and-such argument or present such-and-such evidence, there was no expert to call. First, there was no expert that Mr. Goins argued he should have been able to call at the hearing. His attorney never investigated. His attorney never sought out an expert's opinion. I know that, but that's what you do. You said if the lawyer had done his or her job, this is what a reasonable investigation would have discovered, which would have led to this type of expert, and that expert would have said this, and that testimony would have impacted the case vastly. That's what you do. Correct. But that didn't happen. And so the medical— What do we do now, as counsel, as Mr. Mabry said? Now, out of whole cloths, at the appellate level, at this level, say what that would have been. Respectfully, Your Honor, it did happen. All the medical records that were submitted before the PCR court were evidence as to the nature of what an expert might have said and presented to a juror. Why do you think that's enough? In the South Carolina case, I believe it's Pauling v. State or State v. Pauling, the South Carolina Supreme Court, or the Court of Appeals, I think it's the Supreme Court, found that a nurse's triage notes were enough to grant—were enough to prove ineffective assistance to counsel and grant relief even when she herself was not at the PCR hearing, because the notes were themselves evidence of what she would have—whatever might have testified. So that's as a matter of state law. Now, how do we elevate that determination to a principle that we can apply in an ADEPA, Certificate of Appealability, review? Well, Your Honor, I mean, the whole issue here is whether or not the state unreasonably determined the facts. Right. Did not erroneously determine the facts or apply the law. Correct. All right, this takes us back to my colloquy with you in your opening argument. There's a certain amount of reliance here, and this is not a criticism. It seems to me there's a certain amount of reliance you're bringing to bear on South Carolina law, but we're not applying South Carolina law in this context. Correct. We're applying highly deferential federal law. And so if the South Carolina Court of Appeals was erroneous here in reversing the PCR court, that's a far cry from authorizing us to, in effect, reverse the South Carolina Court of Appeals. And it sounds like—again, this is not criticism of your argument, but it sounds awfully much like that's what you're asking us to do, as if we're sitting here as the Supreme Court of South Carolina. All of these issues are, you know, mixed questions of law and fact. And we—it's important to emphasize we are not, and Mr. Goins is not, challenging South Carolina law at all, stating what South Carolina law is, and that was unreasonably applied to these facts. To the extent that you're relying on a prior case in which a South Carolina appellate court permitted a nurse's note to serve as sufficient evidence to justify post-conviction relief on an ineffective assistance of counsel claim, you are relying on South Carolina law. That's exactly the problem. It may well be that a South Carolina appellate court has done such a thing in a prior case, very similar to this one, perhaps. But how does that help you in federal court in a review burdened with the double deference that Strickland and ADEPA imposed on your client? I see I'm past time. May I briefly answer the question? Yes, you may answer Judge Davis' question. If Mr. Goins—first, there was no expert to call because Mr. Goins' counsel was ineffective. It met a federal level of ineffectiveness and did not investigate. So at the time that this evaluation would have occurred, there was no expert to say, this is what I would have tested. That's why we expect the post-conviction counsel to find the expert. That's what Judge Greger was pointing you at, too, that what typically happens, at least in the successful cases, is post-conviction counsel does what trial counsel failed to do, which is to identify an expert who could be presented to the federal post-conviction court or the state post-conviction court to say, this is what an expert would have been able to do for this guy. And you're sort of bootstrapping and saying, well, we don't have an expert because the trial counsel never identified one. Well, of course. That's part of your claim. But you have to explain why a post-conviction counsel didn't identify one. Okay. I have two brief responses to that. Okay. The first is that because the medical records that he did provide were evidence of what an expert would have testified to. Okay. The second is that even during the trial and during the PCR hearing, Mr. Goins could have presented an expert and might have wanted to had he been evaluated and had an expert, you know, considered him bipolar and whatnot. But he could have just presented these medical records of the 1997 incident and his treatment through and coming up to the incident at question in the trial and say, look at this. In 1997, he strips all his clothes off and climbs a water tower and is clearly, you know, there's something going on. In this incident, he strips all his clothes off, throws underwear on his head, and he's screaming for medication that the state did not provide him. And so there wasn't even necessary. And so there, in and of itself, there's reasonable doubt. And you don't even need to call an expert in order to provide that. And so that would be. Thank you very much. Thank you. And I want to note that you all are caught upon it in the sense that we really appreciate that we couldn't do our work without your help. And would you please, for the record, identify your, I'm sure, your co-counsel on the brief and your help as well? Yes, they did. This is Jackie Worman and Ethan Simon. We're all 3Ls. And both students 3Ls? Graduating in a couple days. Thank you very much for being here. Thank you. Thank you very much. Of course, Mr. Bravery, thank you for ably representing the state of Palmetto State. We'll come down and greet counsel.
judges: Roger L. Gregory, Stephanie D. Thacker, Andre M. Davis